LOUISIANA LAND AND
EXPLORATION
COMPANY

v.

PENNZOIL EXPLORATION AND
PRODUCTION COMPANY

Civil Action No. 96–1779.

United States District Court,
E.D. Louisiana.

April 15, 1997.

Charles Donald Marshall, Jr., Robert Timothy Lorio, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, LA, for plaintiff.

Joe B. Norman, Michael D. Rubenstein, Liskow & Lewis, New Orleans, LA, Frank P. Simoneaux, Stephen Craig Carleton, Simoneaux & Carleton, LLC, Baton Rouge, LA, for defendant.

### ORDER AND REASON

FALLON, District Judge.

Before this Court is the plaintiff's motion for summary judgment on the issue of interest on retained proceeds and on damages and attorney's fees sought by the defendant. The defendant has also moved for summary judgment on the issues of interest on the retained proceeds, as well as the plaintiff's deduction of working expenses, and improper calculation of payouts on the payout from the Dularge RA SU A Well.

For the following reasons, both the plaintiff's and defendant's motions for summary judgment on the issue of interest are DENIED. The plaintiff's motion for summary judgment on damages and attorney's fees sought by the defendant is GRANTED in reference to the defendant's working interest and DENIED in reference to the defendant's royalty interest. The defendant's motions for summary judgment on the plaintiff's deduction of working expenses and improper calculation of payouts on the payout from the Dularge RA SU A Well are DENIED.

### BACKGROUND

Lake Gero Field, an oil and gas producing property, is located in Terrebonne Parish. Over the years, various parties have claimed ownership of portions of the field. Two of these parties, the State of Louisiana and LaTerra Company Inc. (succeeded by and hereinafter Fina), granted mineral leases on the property to Union Producing Company (succeeded by and hereinafter defendant

Pennzoil). Fina awarded Pennzoil a mineral lease on their acreage in the Lake Gero Field in 1948. The State of Louisiana accorded Pennzoil one mineral lease on their property in the Lake Gero Field in 1949 and a second lease in 1970.

Pennzoil as lessee of the lands subleased their mineral interests to Placid. Placid later transferred its interest in these lands to Louisiana Land & Exploration Company (hereinafter LL & E). The terms of this arrangement allowed Pennzoil to retain a one sixteenth overriding royalty. A holder of an overriding royalty participates in the gross value of the production but does not bear any cost of the production. In comparison, a possessor of a working interest while sharing in the gross value of the production bears a proportionate share of the production cost.

In addition to the sublease, Pennzoil and LL & E entered into a farmout agreement on August 17, 1970. This farmout agreement gave LL & E the right to develop additional acreage in the Lake Gero Field. This arrangement awarded Pennzoil the option of retaining either a one-twelfth overriding interest or acquiring a twenty percent working interest in any well developed in the farmout acreage. Thus, two relationships bound LL & E and Pennzoil to each other.

LL & E established production in the Lake Gero Field in October 1970. Before commencing production, LL & E prepared a division order for each new well drilled. A division order is essentially a contract that confirms the division of interest among all parties who own the production obtained from a well and establishes the proportions in which each party is entitled to share proceeds from a well. LL & E drafted twenty-six such documents, (one for each new well drilled) The division orders contained a clause giving LL & E the right to withhold proceeds from oil production in case of a controversy over ownership of property covered by the lease and the farmout agree-

ment. Additionally, a stipulation in these clauses relieved LL & E of an obligation to pay interest on any funds it retained.[1]

Considering the complexity of the situation described above, it is not surprising that a controversy concerning ownership of the Lake Gero Field, arose at approximately the same time LL & E began production. The ownership dispute involved possession of the land, as well as control of royalties, overriding royalties, and working interest on minerals located on the land. The conflict involved three groups, the State of Louisiana, the Harry Bourg Corporation, and Fina. The controversy affected LL & E's relationship with Pennzoil because two of the parties in the dispute had leased portions of the Lake Gero Field to Pennzoil.

The debate over title to portions of the Lake Gero Field continued for over two decades. During this time, purchasers of minerals produced in the Lake Gero field paid LL & E 100% of the sales proceeds leaving LL & E the responsibility to distribute the proceeds among the various royalty and interest owners. LL & E pursuant to the executed division orders retained proceeds from mineral productions attributed to the property in dispute.

Following settlements of the property disputes in 1991 and 1992, LL & E prepared a final and twenty-seventh division order. This division order indicated the proper ownership proportions of the Lake Gero field as well as correct overriding and working interest set forth in the settlement agreements. LL & E mailed this division order to Pennzoil on December 1, 1993. On October 28, 1994, Pennzoil returned the division order to LL & E. Pennzoil, however, had altered the division order by crossing out the interest provision. LL & E wrote Pennzoil on January 25, 1995, disputing Pennzoil's modification of the division order and their demand for interest on the retained proceeds. On September 5, 1995, Pennzoil in a letter repeated its claims for interest on the retained

1. The exact language of the division orders read as follows: "Each of the undersigned hereby .... in the case of an adverse claim ... to the property from which the oil ran to his credit ... agrees to furnish indemnity satisfactory to you against all adverse claims and hereby authorizes you to retain all proceeds accruing to the undersigned without any obligation to pay interest ... until the dispute of the ownership of production involved is settled."

proceeds. Finally on September 11, 1995, LL & E mailed a check in the amount of $509,647.95 to Pennzoil. This check represented Pennzoil's share of retained proceeds minus its share of working expenses from production in acreage covered by the farmout agreement. The amount of the check did not include interest on retained proceeds and Pennzoil accepted the tendered amount under reservation of any right to interest it might have and the right to dispute the deduction of working expenses.

As a result of the dispute, LL & E filed the instant declaratory judgment action seeking determination of the amount it owes Pennzoil as well as damages for alleged overpayment to Pennzoil. Pennzoil has counterclaimed seeking interest on the amount of proceeds withheld by LL & E during the property dispute, reimbursement of incorrectly deducted working expenses, additional working-interest payments due to miscalculation of payout by LL & E on the Dularge RA SU A Well, double the amount of sums due as royalties and working interests and reasonable attorney's fees.

This instant matter involves motions for summary judgment by LL & E on the issue of interest and on damages and attorney's fees sought by Pennzoil. Pennzoil also moved for summary judgment on the issues of interest on the retained proceeds, LL & E's deduction of working expenses, and improper calculation of payouts on the payout from the Dularge RA. SU A Well.

## LEGAL STANDARD

■ Summary judgment will be granted only if the pleadings, depositions, answers to the interregatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. In this analysis, the Court must view the facts and inferences from the evidence in the light most favorable to the nonmoving party. *Crescent Towing v. M/V Anax*, 40 F.3d 741, 743 (5th Cir.1994). Once the moving party has demonstrated that there is no genuine issue of material fact, the burden shifts to the non-moving party to prove there is a

genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585–587, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmoving party may not depend solely on denials contained in the pleadings, but must submit specific facts. Fed R.Civ.P. 56(e). Mere conclusory rebuttals by the nonmoving party will not defeat a motion for summary judgment. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *reh'g denied*, 961 F.2d 215 (5th Cir.), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Moreover if the factual context makes the nonmoving party's claim implausible, the party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). This legal standard will be used in the following analysis.

## ANALYSIS

### I. RETENTION OF INTEREST

The main issue between the two parties is whether or not LL & E owes Pennzoil interest on proceeds it retained during the title dispute over acreage in Lake Gero. Pennzoil answers the query in the affirmative while LL & E responses in the negative. Both parties moved for summary judgment on the issue and rely on complex legal arguments to support their viewpoint. Each party's reasons for summary judgment will now be examined.

### A. LL & E's Movement for Summary Judgment

LL & E's plea for summary judgment rests on three foundations. The first is that the division order is a contract and the parties are bound by it. Secondly LL & E puts forth the idea that Pennzoil's interest in the Lake Gero field did not arise as a mineral lessor and the mineral code and its provisions on interest are not applicable. Finally, LL & E avers the existence of a depositary relationship between itself and Pennzoil.

### 1. *The nature of a division order.*

LL & E asserts that the division orders between it and Pennzoil are contracts and binding on the two parties. The purpose of a division order is to protect the purchaser of the well production by authorizing the distribution of the sale price of the production to certain identified persons in proportion to their respective ownership interests in the minerals as specified therein. *Pan American Petroleum Corp. v. Long,* 340 F.2d 211 (5th Cir.1964). The essential purpose of the division order is to protect the lessee and purchaser from liability for improper payment of royalties. *Williams & Meyers, Oil and Gas Law,* §§ 701–711. A typical division order will include a covenant by the payee to provide satisfactory evidence of title and an authorization for the payor to withhold payment if the covenant is breached or if the payee's title is disputed.[2]

When courts in Louisiana have examined division orders they have characterized them as contracts with established purposes and relationships. *JFD Inc. v. Chappuis,* 615 So.2d 492 (La.App. 3rd Cir.1993). The Louisiana Mineral Code also states that a division order is a contract. La.Rev.Stat. 31:212.31(A)(2) (West.1989). Whether or not a division order is called a "contract," it is binding on the parties until revoked. *Pan American,* 340 F.2d at 211. However, despite its status as a contract, a division order may not alter or amend the terms of an underlying oil and gas lease. La.R.S. 31:138.1(B) (West Supp.1997). To the extent it does, the division order is invalid and the terms of the oil and gas lease take precedence. *Id.*

In the current case, LL & E drafted division orders setting out the nature of each owner's interest and the proportion in which each owner would share in the production proceeds. LL & E formulated and sent to all parties a division order for each well it drilled in the Lake Gero field. These parties, including Pennzoil, signed and returned the division orders to LL & E. Thus, there were twenty-six signed division orders or contracts binding the parties.

LL & E originated a final division order after the title dispute had settled. This division order set out the percentage of each parties' property rights as set forth in the property settlements. Pennzoil returned this order, but not before making modifications to language in it. Both Pennzoil and LL & E contest the legitimacy of relying on this final division order in their movements for summary judgment on the issue of retained interest and this will be discussed below.

Along with advocating a contractual relationship with Pennzoil via the division orders, LL & E advances the proposition that the division orders are clear and unambiguous and no inquiry should be made into the intent of the parties in executing the division orders. Pennzoil asserts a presence of ambiguity in the division orders because of the use of the words accrue and pay in reference to the retained proceeds of production.[3] Pennzoil is correct in pointing out the usage of both words in the division orders. When language of an agreement, however, is susceptible of two meanings it must be interpreted in the sense most congruous to the whole contract. *United Carbon Co. v. Interstate Natural Gas Co.,* 176 La. 929, 147 So. 37 (1933). The division orders existed to authorize LL & E to pay out proceeds in accordance with proportions of ownership of oil producing land and to retain proceeds in case of disputed ownership. Use of two different words when referring to this purpose should not be allowed to defeat this purpose. Accordingly, Pennzoil's argument of incongruity of the division order is rejected.

LL & E's first assertion that division orders are a contract is a correct statement. Moreover, the allegation of ambiguity in the division orders by Pennzoil lacks substance. Despite the existence of binding contracts between the two parties, the Louisiana Min-

---

2. *See also* Stuart C. Hollimom *Division Orders–A Primer,* Thirty–Fourth Annual Institute on Oil and Gas Law and Taxation. (Matthew Bender, 1983).

3. The exact language Pennzoil points to is "Each of the undersigned ... hereby authorizes you to retain all proceeds **accruing** to the undersigned without any obligation to **pay** interest on the amount so withheld." (emphasis added)

eral Code bans a division order from altering an underlying obligation of law and contract. La R.S. 31:138.1(B) (West Supp.1997). The effect of this statute on the division orders between Pennzoil and LL & E will be examined below.

### 2. *Pennzoil status as a mineral lessor.*

██ In an attempt to avoid application of the mineral code provisions to this case, LL & E maintains that Pennzoil fails to occupy the position of a mineral lessor. To sustain this assertion they have submitted a supplemental affidavit of Wesley V. Gravolet which states that Pennzoil was not a lessor under any of the mineral leases comprising the Lake Gero field.[4] Pennzoil on the other hand puts forth an affidavit of its own asserting it held the position of a mineral lessor.[5] Clearly these conflicting statements indicate the existence of an issue of material fact, therefore, LL & E's motion for summary judgment must fail.

### 3. *LL & E acted as a depositary for Pennzoil.*

██ LL & E argues in the alternative even if there was no contractual waiver of an interest obligation, Louisiana law fails to impose an obligation to pay interest. LL & E bases this argument on the assertion that a depositary relationship existed between them and Pennzoil. A deposit is an act by which a person receives the property of another binding himself to preserve it and return it in kind. La.C.C.Art. 2926 (West 1987). A depositary owes no interest for the money deposited in his hands, except from the day on which he became a defaulter by delaying to restore it. La.C.C. Art. 2948 (West.1987). To prove the existence of a depositary relationship, the mutual consent of the parties and delivery must be demonstrated. *Harper v. Brown & Root, Inc.,* 391 So.2d 1170. 1172 (La.1980). In addition once the property of another is in the hand of a depositary, the depositary can not make use of the thing deposited. La.C.C. Art 2940 (West.1987).

In the instant case, while claiming to be a depositary for Pennzoil, LL & E does not submit any evidence to establish the requisite intent or mutual consent needed to form a depositary relationship. It merely asserts a depositary relationship existed between it and Pennzoil without any documentation to sustain the assertion. While there was an agreement (the division orders) between LL & E and Pennzoil for LL & E to retain production proceeds, mutual consent to establish a depositary relationship is absent. Thus, LL & E has failed to prove it held the position of a depositary for Pennzoil and cannot escape paying interest on the retained proceeds by reliance on such grounds.

Consequently, in its movement for summary judgment on the issue of interest on retained funds LL & E has correctly asserted the first twenty-six division orders between it and Pennzoil existed as clear and unambiguous binding contracts. LL & E, however, has failed to prove it had a depositary relationship with Pennzoil. Since there is still doubt as to the application of the mineral code to the division orders and Pennzoil's status as a mineral lessor, summary judgment on the issues in LL & E favor is denied.

### B. Pennzoil's Movement for Summary Judgment

Pennzoil, in crafting its legal arguments, puts forth two assertions. One is that the contract between them and LL & E is an ex contractu and the other is that this Court should repudiate reliance on the division orders. It bases this last plea on three arguments: 1) the nature of division orders cannot alter or amend underlying obligations of law and contract, 2) each prior division order was revocable by its own terms and all prior orders were revoked by the last division order, and 3) LL & E's failure to demand indemnity from Pennzoil as required by the language contained in the division orders precludes reliance on the division orders. To

---

4. See Exhibit A of LL & E's Memorandum in Opposition to Pennzoil's Cross Motion for Partial Summary Judgment.

5. See Exhibit 1 of Memorandum in Support of Pennzoil's Motion for Partial Summary Judgment and in Opposition to LL & E Motion for Partial Summary Judgment.

avoid confusion in a complex legal morass, the Court concludes it will be beneficial to discuss each contention separately.

## 1. *Ex contractu issue*

■ Pennzoil's first assertion is that its rights on its overriding royalty interest and working interest arose by contract. Pennzoil is correct in this assertion because its farm-out agreement with LL & E and its sublease with Placid who assigned it to LL & E can be characterized as contracts. When the object of performance in a contract is a sum of money and there is delay in payment then the obligee may receive interest on the amount due from the time the sum is due. La.C.C.Ann. Art. 2000 (West 1987).

■ In the instant case, the sum of money was not due Pennzoil until there was a settlement of the property dispute or Pennzoil furnished indemnity (the issue of indemnity will be discussed infra). This is proven by language contained in the executed division orders giving LL & E the right to retain proceeds from disputed acreage until settlement of the property dispute. Thus, the debt LL & E owed Pennzoil became due upon settlement of the property dispute or furnishing of indemnity therefore, Pennzoil is unsuccessful in stating the debt became due at time of production.[6]

## 2. *Reliance on division orders*

a. *Nature of division orders on underlying law and contract.*

■ Pennzoil argues division orders have a limited reach and supports this theory by citing R.S. 31.138.1(B) (West 1997 Pocket Part), enacted in 1992, which states a division order may not alter or amend the terms of an oil or gas lease. LL & E argues its last division order with Pennzoil became effective back to the date of first production in 1970 and R.S. 31:138.1(B) should not be applied retroactively. To counter this, Pennzoil as-

serts that R.S. 31:138.1(B) merely codified existing law and, therefore, should be applied retroactively.[7] The cited language comes from a per curiam opinion denying an application for rehearing and declaring that the purpose for which a division order is executed repels the implication that it is intended to affect the obligations of the operator to the royalty owner.

■ In the absence of legislative intent on the issue, a law must be interpretive before it can be applied retroactively. *Manuel v. Louisiana Sheriff's Risk Management Fund,* 664 So.2d 81 (La.1995). An interpretive law is one that clarifies methods by which existing rights can be enforced rather than establishes new rights. *Utley–James of Louisiana Inc. v. State Div. of Admin. Dept. of Facility Planning and Control,* 593 So.2d 1261 (La.App. 1st Cir.1991), *writ denied* 597 So.2d 1036 (La.1992). While Pennzoil has submitted evidence attempting to prove R.S. 31.138.1(B) is interpretive, neither party has submitted evidence of legislative intent on the issue of retroactivity.[8] Until the intent of the legislature has been ascertained, it would be unwise for this Court to apply the quoted statute retroactively.

■ Alternatively, Pennzoil argues that courts have refused to allow division orders to modify contracts even to protect third parties except in special circumstances. Nevertheless, when there is consideration and detrimental reliance sufficient to create estoppel courts will allow division orders to modify contractual relationships. In the instant case, Pennzoil argues that both of these elements are absent.

■ In Louisiana, cause rather than consideration is the key contractual requirement. An obligation cannot exist without a lawful cause. La.C.C.Ann. Art.1966 (West. 1987). Cause is defined as the reason for making the contract. *Tippins v. Pine Valley School,* 173 So. 566 (La.App.1937). LL & E

---

6. While, it is unclear if LL & E owes Pennzoil interest on retained funds from the period of receipt of funds until settlement of the property dispute, LL & E owes Pennzoil interest on funds retained from date of settlement until date of disbursement to Pennzoil.

7. Pennzoil cites *Kaufman v. Arnaudville Co.,* 186 So.2d 337, (La.App. 3rd Cir.). in support of its contention.

8. The parties have also failed to brief this issue.

asserts the cause for the division orders is to reflect proportionate ownership so LL & E could distribute proceeds according to this proportionate ownership. LL & E distributed proceeds from the Lake Gero field wells in two instances. They distributed $929,000 of proceeds on undisputed acreage during production and $509,647 of proceeds from the disputed acreage after the property settlement. It is doubtful Pennzoil would have signed division orders unless a cause existed. LL & E has aptly pointed out the reason Pennzoil signed the division orders and the advantages they obtained as a result of the division orders. Thus, cause existed as to the division orders.

■ As to the issue of detrimental reliance, the person claiming protection as the result of its existence must prove: (1) a representation was made; (2) there was justifiable reliance on that representation; and (3) there was a change in position to one's detriment because of that reliance. *Law v. City of Eunice*, 653 So.2d 149 (La.App. 3rd Cir.1995). LL & E as potential beneficiary of detrimental reliance in this instance must prove these three issues. A review of the evidence establishes they have done this. First, the division orders stated that LL & E could retain the proceeds from the disputed acreage without paying interest. Second, LL & E was justified in relying on the no-interest provision because Pennzoil never gave an indication of its displeasure with the provision until after settlement of the property dispute. Third, LL & E acted on the assumption that they were free of any obligation to pay Pennzoil interest on the retained funds and failed to set aside monies to do so. A duty to now pay a sizable interest fee would effect LL & E to its detriment. Thus both cause (consideration) and detrimental reliance pertaining to the division orders are present and under Louisiana jurisprudence the division orders would be allowed to modify any underlying contractual obligations between the parties.

Accordingly, Pennzoil's first argument as to the inapplicability of the division orders must fail. While it is unclear if R.S. 31:138.1(B) applies to the division orders executed between the parties, cause existed for

the division orders and LL & E relied on the division orders to their detriment. Thus, the division orders may alter the underlying contractual obligations between the parties through the doctrine of estoppel. While the division orders can be enforced through estoppel, it is less clear to what extent the division orders can modify underlying obligations of law and contract. This is the exact problem which undermined LL & E's motion for summary judgment.

b. *Revocability of Prior Division Orders.*

■ The second argument Pennzoil asserts to support its viewpoint that the division orders should not be relied upon is that all prior division orders were revocable by their terms and the last division order which provided the basis for disbursement revoked all prior division orders. The language in each executed division order stated that the division order was effective until LL & E received further written notice. Execution of a final division order took place upon settlement of the property dispute. Pennzoil argues that this division order revoked all prior division orders because final disbursement was based on this division order.

■ Even if it is conceded that all 26 prior division orders were revoked by the 27th division order it does not follow that the 27th division order was valid. As mentioned above, division orders are considered contracts and the linchpin of a contractual relationship is mutual consent. Pennzoil attempts to display mutual consent by pointing to the fact that LL & E did not rescind or revoke the final division order. However, before a division order can be rescinded or revoked, it must first be valid through mutual consent. LL & E offers into evidence correspondence between it and Pennzoil demonstrating that LL & E did not give consent to the last division order because Pennzoil crossed out language relieving LL & E of an obligation to pay interest on retained funds. Thus, the fact that LL & E failed to rescind or revoke the last division order is unimportant.

■ Pennzoil in another attempt to verify validity of the last division order points to

the detail that LL & E dispensed funds according to the fractional ownership set forth in the order. Pennzoil believes this disbursement stands for the hypothesis that LL & E agreed to Pennzoil's modification of the last division order. However, if this were true then LL & E's disbursement would have included interest on the withheld proceeds. Thus, Pennzoil cannot rely on the revocability of prior division orders to support the proposition of lack of reliance on the division orders.

c. *Failure of LL & E to demand indemnity from Pennzoil.*

■ A final argument that Pennzoil relies on is failure of LL & E to demand indemnity. The language of the division orders states that Pennzoil agrees to furnish indemnity satisfactory to LL & E and LL & E can retain all proceeds without any obligation to pay interest until the required indemnity shall have been furnished or until the dispute as to the ownership of the production is settled. Pennzoil argues that this language requires LL & E to demand indemnity from Pennzoil and the failure of LL & E to demand indemnity gives LL & E an obligation to pay interest. According to Pennzoil only if indemnity is requested of Pennzoil and Pennzoil fails to furnish the indemnity does the "no interest language" become operative.

An examination of the quoted language, however, fails to support Pennzoil's assertion.[9] The language seems to offer LL & E a choice of not paying interest on retained funds until the required indemnity has been furnished or until the property dispute is settled. Additionally, the language concerning requirement and demand of indemnity is at best ambiguous. While it does not expressly require LL & E to demand indemnity from Pennzoil it refers to the indemnity as required. Thus, it is unclear if LL & E had the duty to require indemnity of Pennzoil or if Pennzoil's duty encompassed offering indemnity unsolicited.

■ When language is vague or ambiguous courts look to the intent of the parties in interpreting the contract. The circum-

stances surrounding the parties at the time of contracting are the relevant subjects of inquiry. *Henry v. Ballard & Cordell Corp.,* 418 So.2d 1334 (La., 1982). Pennzoil has not offered evidence to support the assertion that at the time of executing the division orders it anticipated having to furnish indemnity to LL & E. Thus, the Court has no evidence with which to judge the circumstances or intent of Pennzoil and LL & E at the time of executing the division orders with regard to furnishing of indemnity.

In conclusion, the basis for Pennzoil's request for summary judgment rests on two grounds. The first ground is that the basis for Pennzoil's interests in the Lake Gero field arose via ex contractu and interest on debts from an ex contractu starts to accumulate at the time the debt becomes due. Pennzoil asserts the debt from the Lake Gero field (the proceeds from well production) became due when LL & E sold the production from the Lake Gero field to buyers. In this case, however, the executed division orders established the due date on the debt as either the time Pennzoil furnished indemnity to LL & E or settlement of the property dispute occurred. Thus, the first ground for Pennzoil's motion for summary judgment lacks merit.

The second ground for summary judgment Pennzoil asserts is that reliance on the division orders concerning the Lake Gero field production should be avoided. It cites La R.S. 31.138.1(B), forbidding division orders from altering underlying oil or gas leases which was recently enacted and urges it be applied retroactively. Whether La.R.S. 31.138.1(B) should be applied retroactively is unclear due to lack of legislative intent on the issue of retroactivity. Regardless, LL & E has shown existence of cause and detrimental reliance concerning the division orders and in such a situation the doctrine of estoppel would allow the division order to modify an underlying obligation. The fact to be resolved is the extent of such a modification. Furthermore, language in the division orders creates doubt as to whether or not LL & E was required to ask Pennzoil for indemnity or if Pennzoil was to offer indemnity spontaneously. Thus, since several issues of mate-

9. *See supra* note 1.

rial fact still exist, Pennzoil's motion for summary judgment is denied.

## II. RETENTION OF JOINT OPERATING EXPENSES BY LL & E

In addition, to filing a request for summary judgment on the issue of interest on retained proceeds, Pennzoil is also seeking summary judgment stating LL & E incorrectly deducted joint operating expenses on Lake Gero acreage regulated by the farmout agreement. Pennzoil's working interest with LL & E in the Lake Gero acreage was regulated by the farmout agreement. As outlined above, a holder of a working interest shares in both the proceeds and the production expenses. The farmout agreement contained as an attachment a Council of Petroleum Accounting Society of North America (COPAS) accounting procedure sheet.[10] Paragraph four and six of the accounting procedures are applicable to the present point. Paragraph four, entitled statements and billings, required LL & E to bill Pennzoil on or before the last day of each month for their proportionate share of costs and expenses for the preceding month. Paragraph six, entitled adjustments, allowed changes in either LL & E or Pennzoil's favor if they made a written exception within twenty-four months of the end of the calendar year in which Pennzoil received all bills and statements of expenses. Failure of either party to file a written exception, established a conclusive presumption of the authenticity and accuracy of the bills.

Pennzoil's plea for summary judgment on this point raises two issues between the parties The first issue is whether or not the parties adopted the general accounting provisions to the farmout agreement. LL & E in opposition to Pennzoil's motion for summary judgment states that the farmout agreement failed to fully embrace the general accounting provisions. Language of the farmout

agreement is cited in support of this position. LL & E points to words in the farmout agreement that expressly adopts Exhibit A (Exhibit A is additional terms and conditions), and the lack of language that expressly adopts Exhibit B (general accounting provisions) as part of the farmout agreement. LL & E also suggests wording in the farmout agreement at pages three and four demonstrates that the general accounting provisions signify when a payout occurred and when Pennzoil would acquire a working interest and were not meant to be used to calculate working expenses.[11]

Pennzoil in an attempt to rebut these assertions alleges that handwritten and typewritten revisions to the general accounting provisions attached to the farmout agreement indicated the required detailed billing. Pennzoil hypothesizes that if the general provisions clarified payout, the parties lacked the need to delineate specific billing requirements. Moreover, Pennzoil points out that LL & E used general accounting provisions identical to those in the farmout agreement to ascertain its entitlement to expense reimbursement. Thus, Pennzoil puts forth the proposal that the general accounting provisions applied to the farmout agreement between the two parties.

A second issue between the two sides assumes the general accounting provisions do apply to the farmout agreement. Pennzoil contends that if the farmout agreement adopted the general accounting provisions LL & E lacked the right to deduct production expenses from its share of the proceeds from the acreage governed by the farmout agreement. The justifications for this contention are two-fold. One is that LL & E never rendered any bills to Pennzoil detailing the production expenses until December 1, 1993. Pennzoil declares this breaches paragraph four of the general provisions of the accounting procedure outlined in the above

---

10. See Exhibit F of Pennzoil's Memorandum in Support of Its Motion for Partial Summary Judgment and In Opposition to LL & E's Motion for Partial Summary Judgment.

11. The exact language LL & E relies on for this assertion is as follows: overriding royalty interest shall automatically terminate and convert to

the above working interest when you (LL & E and LaTerra) have recovered the costs and expenses of drilling, completing, and equipping the Earning Well plus necessary and reasonable expenses of operations (computed in accordance with the Accounting Procedure attached hereto as Exhibit "B").

paragraph. Another basis for Pennzoil's contention is the alleged violation by LL & E of paragraph six of the general provisions of the accounting procedure outlined earlier. Pennzoil states even if LL & E's letter of December 1, 1993 can be construed as proper billing, paragraph six prohibits adjustment in LL & E's favor unless LL & E made written exception within twenty-four months of the end of the calendar year in which all bills and statements of expenses were rendered to Pennzoil. Such a failure on LL & E's part bars them from receiving any adjustments in their favor.

LL & E in opposition asserts that even if the parties had adopted the general accounting provisions, LL & E never rendered any bills to Pennzoil and the twenty-four month period for adjustments applied only to rendered bills. Therefore, the lapse of the twenty-four month period failed to bar an adjustment favorable to Pennzoil or LL & E. It backs up this conclusion by citing *Exxon Corp v. Crosby–Mississippi Resources, Ltd.,* 775 F.Supp 969 (S.D.Miss 1991) In that case, the court held that actual receipt of bills by non-operators is necessary for a presumption of correctness to attach to expenses and the twenty-four period for bill adjustment to begin to run. That court based its reasoning on the fact that a non-operator cannot be expected to take written exception to bills it never received. LL & E wants to use this holding to support its contention that since it failed to bill Pennzoil, the twenty-four month period in which adjustments could run in its favor still exist. The holding in *Exxon,* however, fails to support LL & E's assertion. The court in *Exxon* applied its holding only to operators. Moreover, *Exxon* would seem to support Pennzoil's rather than LL & E's position on this issue.

■ Pennzoil as movant on this matter has the burden of proof to demonstrate the lack of an issue of material fact and all evidence will be construed in the light most favorable to LL & E. Pennzoil has submitted evidence to indicate the general accounting provisions apply to the farmout agreement and breach of these provisions by LL & E

entitles them to summary judgment. LL & E, on the other hand, has put forth evidence that the farmout agreement failed to incorporate the general accounting provisions that it is accused of breaching. The application of the general accounting provisions is a pivotal issue of material fact and while Pennzoil has submitted evidence supporting its viewpoint, LL & E has also submitted evidence to advance the basis for its viewpoint. Therefore, since an issue of material fact is in controversy, summary judgment on this matter would be inappropriate.

### III. DULARGE RA SU A WELL ISSUE

■ Turning to another issue, Pennzoil professes that LL & E on payouts from one of the wells in the *Lake Gero field* (the Dularge RA SU A Well), mistakenly based its payment to Pennzoil on a .0051197 overriding royalty interest when the payment should have been made on .0245744 working interest combined with a one-sixth royalty burden. Therefore, Pennzoil's payment should have been based on a net revenue interest of .020479 and that the underpayment amounted to $22,675.71.[12]

LL & E in opposition to this matter indicates that the well from which the disputed proceeds originated falls out of the disputed acreage that is the basis for the instant lawsuit. In addition, LL & E asserts that any claims for royalty miscalculations has prescribed. To uphold this declaration, they point out that the prescriptive period for royalty miscalculations is three years. La. C.C. Art. 3494(5) (West.1994). Since Pennzoil received no further proceeds from this well after production terminated in 1979, LL & E maintains prescription for Pennzoil's cause of action in this matter has lapsed.

■ While LL & E is accurate in asserting that there is a three year prescriptive period in which to contest royalty miscalculations, this period does not begin to run until the royalty owner through reasonable diligence knows they have a claim against the lessee. *Frey v. Amoco Production Co.,* 943 F.2d 578, 586 (5th Cir.1991). Neither side

---

12. See Exhibit 1 of Pennzoil's Memorandum in Support of Its Motion for Partial Summary Judgment and in Opposition to LL & E's Motion for Partial Summary Judgment.

922

has submitted indication of when Pennzoil comprehended they had a claim against LL & E for royalty miscalculations. Thus, it would be inappropriate for this Court to grant summary judgment because an issue of material fact exists. Accordingly, Pennzoil's motion for summary judgment on this matter is denied.

## IV. ATTORNEY'S FEES AND DAMAGES

 Pennzoil in its counterclaim has asked for double damages and attorney's fees on its working and royalty interest claims against LL & E. LL & E in resisting these demands has sought summary judgment in their favor on this issue. Their basis for this request is La. R.S. 31:212.21 *et seq* (West Supp.1994). These statutes indicate that damages and attorney's fees are applicable only when there is nonpayment of production payments or royalties, but not working interests. Pennzoil concedes that its claim for damages and attorney's fees fails to attach to its working interest, but reserves its right to establish at trial its entitlement to damages and attorney's fees relating to its overriding royalty interest. Consequently, LL & E's motion for summary judgment is granted with respect to Pennzoil's request for double damages and attorney's fees relating to nonpayment of its working interest and denied with respect to Pennzoil's submission for double damages and attorney's fees with respect to nonpayment of its royalty interest. Pennzoil may reserve its claim with respect to the overriding royalty interest.

## CONCLUSION

For the forgoing reasons, the Court makes the following findings:

1). LL & E's motion for summary judgment concerning payment of interest on retained funds is DENIED. Pennzoil's motion for summary judgment on the issue of payment of interest is also DENIED.

2). Pennzoil's motion for summary judgment concerning retention of joint operating expenses by LL & E is DENIED.

3). Pennzoil's motion for summary judgment concerning incorrect calculation of proceeds from the Dularge RA SU A Well is DENIED.

4). LL & E's motion for summary judgment is GRANTED with respect to Pennzoil's request for double damages and attorney's fees relating to nonpayment of its working interest and DENIED with respect to Pennzoil's submission for double damages and attorney's fees with respect to nonpayment of its royalty interest.